HARDY, Judge.
This is a compensation claim in which plaintiff sought recovery from defendant, as his employer’s insurer, as for permanent, total disability. After trial there was judgment rejecting plaintiff’s demands, from which he prosecutes this appeal.
On April 21, 1955, while engaged in the performance of his duties as a sawyer in the mill of Rogers & Evans Lumber Company at Converse, in Sabine Parish, Louisiana, plaintiff sustained a severe blow to his skull at a point above the right ear. The accident occurred while plaintiff was attempting to remove a log from the conveyor chain by use of a cant hook, in cooperation with the employment of a compressed air blast which was operated by a fellow employee. The cant hook became stuck, and, when the log was dislodged by the air blast, the handle of the cant hook struck plaintiff forcibly on the head, inflicting the injuries which are alleged to have caused his permanent and total disability.
Plaintiff was paid compensation at the rate of $30 per week until July 14, 1955, upon which date payments were discontinued. Trial of the case was had on December 13, 1955, and the case was left open for the taking of depositions of medical experts *788 for both plaintiff and defendant. On February 28th the case was reopened, on motion of plaintiff, for the purpose of taking- additional depositions of medical experts, and defendant was granted the right to take depositions by way of rebuttal. Judgment was rendered on September 20, 1956.
The record contains something in excess of 400 pages of testimony, by far the greater part of which is made up of the testimony, on trial, by three medical experts and ten separate medical depositions. Plaintiff was examined by a total of seven physicians, who testified one or more times, two of these medical experts being tendered by plaintiff and five by defendant. The record further includes the testimony of two radiologists, one as a witness for plaintiff and one for defendant.
The allegations of plaintiff’s petition with reference to the nature of his injuries are pertinent to a consideration of this cause, and, accordingly, we quote as follows:
"8.
“That as a result of the aforesaid accidental injuries petitioner sustained and continues to suffer injuries to the bones, muscles, joints, tendons, nerves, tissues, ligaments, cartilages and flesh of his neck, head, shoulder, arms and back.
“9.
“That petitioner has been under the treatment of medical doctors since the date of the accident and has been informed by said medical specialists that he is suffering with post cerebral concussion syndrome, nervousness, whiplash injury to the neck with cervical sprain and injury to the occipital nerve causing occipital neuralgia, together with a possible sub-dural hematoma.
“10.
“That while petitioner does not know the exact nature of his injuries and disability, he believes the above diagnoses to be correct and allege same to exist and to be the cause of his disability.”
The allegation set forth in Article 8 of plaintiff’s petition, as quoted supra, is nothing more than the somewhat customary form of “scatterload” averment. In the light of the testimony in the instant case the alleged injuries are reduced to those which involve the possibility of injury to the head. The specifications set forth in Article 9 of the petition comprehend (a) “post cerebral concussion syndrome”; (b) “nervousness”; (c) “whiplash injury to the neck with cervical sprain”; (d) “injury to the occipital nerve causing occipital neuralgia”; and (e) “possible subdural hematoma”. With respect to these alleged injuries we set forth, seriatim, our conclusions, based upon the testimony of the medical experts.
According to the concensus, with the exception of the opinion of one witness, of the numerous distinguished neurological experts who testified in the case, the term “post cerebral concussion syndrome” appears to be a sort of medico-legal catch-all expression which has no real scientific recognition or application. The term is used by lawyers and by some doctors for the purpose of conveying an impression of residual effects resulting from a trauma of the skull. In the instant case we do not find that the terminology has any particular significance, and, in any event, the intent sought to be conveyed is adequately considered and determined by the conclusions expressed by medical experts in connection with other more definite expressions.
With reference to the specification of “nervousness”, the record does not sustain the finding of any nervous tension or effects which are causally connected with the accidental injury.
As to the “whiplash injury to the neck with cervical sprain”, the testimony of Dr. Kingsley, an orthopedic specialist, justifies the conclusion that plaintiff did suffer such an injury but that he had recovered there *789 from, without disability, prior to the discontinuance of the compensation payments. The testimony of the witness comprehended the injury under the general designation of a sprain of the neck, from which he opined plaintiff had recovered at the time of his examination on June 16, 1955, and was able to return to work “at any time.”
Despite a difference of opinion as to the injury to the occipital nerve as the result of the accident there is no question but that plaintiff did suffer from headaches and occipital neuralgia. The neurectomy performed by Dr. John B. Sutton on September 23, 1955, which effected the severance and partial removal of the greater and lesser occipital nerves on the left side, according to the testimony of both Dr. Sutton and plaintiff, relieved this condition.
The possibility of the existence of a sub-dural hematoma or some other space occupying intracranial lesion appears to have been completely eliminated. This diagnosis, made purely upon the basis of a possibility, was considered only by Drs. Sutton and Faludi and disagreement therewith is evidenced by the opinions of the other medical experts. In any event, we think an exploratory operation or trephination performed by Dr. Sutton completely served to eliminate the validity of this diagnosis. This conclusion is not weakened by the testimony of Dr. Sutton, who continued to insist upon the possibility of the existence of a hema-toma higher in the brain hemisphere, even after his trephination failed to disclose any evidence thereof. With due respect to the opinion of this witness we think the testimony of other equally distinguished experts in the same field conclusively preponderates.
By reason of the serious and unusual nature of this case and the diligent efforts of counsel for the parties litigant, we think it desirable to comment in some detail upon the testimony of the impressive array of expert medical witnesses.
Immediately following the accident plaintiff was removed to the Allen Sanitarium in Converse where he was attended and treated by Dr. O. L. Sanders, a general practitioner. Dr. Sanders testified that plaintiff first complained only of headaches, and, after keeping him in the clinic for several days, making thorough examinations and x-rays of his head, he permitted him to return to his home. He continued consultations and examinations of plaintiff for several weeks. The witness testified that plaintiff made no complaints of dizziness until sometime after the cessation of his headaches, and Dr. Sanders was first informed of the complaints of dizziness after plaintiff was placed under treatment with Dr. Faludi.
The plaintiff was referred by the defendant insurer, for^ examination and treatment, to Dr. Daniel M. Kingsley, an orthopedic surgeon of Alexandria, who also testified as a witness for defendant. This doctor found upon first examination of plaintiff on June 16, 1955, that the patient was “recovering from a sprained neck and contusions and perhaps contusion of his skull and brain.” The witness found no conditions requiring treatment and felt that plaintiff was able at the time of the examination to return to work. There was no change in this opinion as the result of a second examination on June 28, 1955.
On July 8, 1955, Dr. Kingsley wrote Dr. Frederick C. Boykin of Shreveport, a specialist in neurological surgery, and made an appointment for an examination of plaintiff. A complete neurological examination was made by Dr. Boykin on July 18, 1955, at which time plaintiff’s principal complaints were of pain in the left side of the neck and headaches. There was no complaint of dizziness. Dr. Boykin testified, on behalf of defendant, that as the result of his examination he could find no reason why plaintiff should be considered disabled nor why he could not return to his regular occupation as a sawmill worker. The witness testified that his neurological examination was “entirely within normal limits and and he could not find any symptoms for his subjective complaints.”
*790 X-ray examinations of plaintiff were made by Dr. David S. Malen, a radiologist of Baton Rouge, who testified by deposition. The examination of the skull disclosed no evidence of fracture nor of increased intracranial pressure, and an examination of the cervical spine disclosed no fracture nor displacement of the vertebrae. The witness found nothing abnormal, and the only positive result of his examination was the disclosure of the possibility of sinusitis in the paranasal sinus. This x-ray examination had been made at the request of Dr. Edelman.
. On September 16, 1955, at the request of a representative of defendant insurer, plaintiff was examined by Dr. Joseph M. Edel-man, a medical practitioner in the field of neurological surgery. The testimony of Dr. Edelman, a witness for defendant, is contained in two depositions taken respectively on December 20, 1955, and May 12, 1956. The doctor testified that he made a complete neurological examination of plaintiff, on the date set forth, with the benefit of x-rays made by Dr. Malen; that plaintiff was complaining of pain in the head and neck and that after examination the witness concluded the patient had no residual disability as the result of the injury which occurred on April 21, 1955. The witness testified that he was informed prior to his examination of plaintiff that a suggestion had been made with reference to the advisability of the severance of the occipital nerve for the purpose of relieving plaintiff’s complaints. The witness felt that such a procedure would be a “great error and mistake” and he expressed this opinion to the patient and to the representative of the insurer.
In his testimony the witness quoted and reiterated statements from his written report, as follows:
“I see no reason for further treatment in this case and feel, actually, that no further treatment is indicated.
* * * * * *
“I think it would be an error to submit this patient either to injections in any form, to nerve cutting, or to any other procedure as I find no indications for such procedures.”
As reflected in his second deposition taken on May 12, 1956, this witness testified that he again performed a complete neurological examination of plaintiff on March 19, 1956, which was six months subsequent to his first examination. The witness testified he was informed that subsequent to his first examination the plaintiff had been subjected to a neurectomy of the right greater occipital nerve, following which operation he had been relieved of the pain in his neck but had experienced a persistence of the head pains. The doctor testified that on-the occasion of March 19, 1956 examination the patient for the first time mentioned complaints of dizziness.
The doctor testified in great detail as to his examination. The witness was informed that, in addition to the neurectomy, plaintiff had submitted to two pneumoence-phalograms and a trephination operation. The witness examined x-ray films and was asked if he could justify, professionally, the exploratory operation of trephination, to which he answered:
“Absolutely nót. I think that these films can be considered completely normal, and I see absolutely no indication for what was done in this instance.”
The conclusion reached by. this witness with reference to plaintiff’s condition was expressed as follows:
“I could see nothing in his examination that would cause him any disability. The patient has complete use of all of his extremities. He is, a well developed, muscular man who has no weakness of any portion of his body. The only residual neurological finding which he has, aside from the presence of the scars on the head in the two' locations I have already described, is *791 a numbness of a certain portion of the posterior aspect of his head. That, in itself is in no way disabling, and I found nothing else on this patient that would be disabling.”
The witness further testified that the numbed area of the head was the direct result of the occipital- neurectomy and that he found no explanation in the way of objective findings which would account for plaintiff’s complaints of dizziness.
The testimony of Dr. Dean H. Echols of New Orleans, a specialist in neurosurgery, was taken by deposition on behalf of defendant on May IS, 1956. The witness made a thorough neurological examination of plaintiff on March 20, 1956, at which time plaintiff complained of a spinning in the head. In connection with his examination this witness also examined the x-ray pneumoencephalograms which had been made of plaintiff and testified that he discovered nothing of particular interest in the films. Dr. Echols’ neurological examination was negative, and it was his opinion that plaintiff had sustained a minor head injury and that his “residual complaints are due to conscious or sub-conscious simulation.”
Dr. Boykin again testified, by deposition, on May 4, 1956, with reference to an examination of plaintiff made on April 6, 1956, at which time the patient was complaining of severe headaches, dizziness and blurring of vision. This witness examined the pneumoencephalograms and testified that he found nothing in these x-rays which indicated any evidence of a space taking intracranial lesion. The witness testified that he found nothing in his examinations nor in the x-rays which would have indicated the advisability of the trephination to which plaintiff had been subjected. This witness found no foundation for plaintiff’s complaints and did not consider him to be disabled.
Drs. Henry K. Faludi and John B. Sutton of Shreveport, who are associated in the practice of neurological surgery, testified by deposition on May 9, 1956, as witnesses for plaintiff. The plaintiff was first examined by Dr. Faludi on August 1, 1955, at which time he complained of pain and numbness in the back of the head, occasional nausea and dizzy spells. The witness testified that upon examination he found:
“that this patient had a whiplash injury to the neck with cervical sprain and occipital neuralgia, and I also thought that he probably had a post-cerebral concussion syndrome, which was mild, with residual dizziness and black-out spells and nervousness.”
As the result of examinations of Drs. Sutton and Faludi both of these specialists concluded that there was a suspicion of a subdural hematoma or some nature of space taking intracranial lesion. Dr. Sutton recommended, and on September 23, 1955 performed, under general anesthesia, a neurectomy, which accomplished the severance and partial removal of the greater and lesser occipital nerves on the left side. This operation was intended to relieve plaintiff’s head pains and Dr. Sutton testified that following the surgical procedure the patient’s pain subsided and eventually disappeared. In this connection it is worthy to repeat that, on trial of the case, plaintiff testified he had not suffered headaches and neck pains since the performance of this operation.
Dr. Sutton was re-examined by deposition taken on May 4, 1956, and on this occasion the witness testified that after continuance of plaintiff’s complaints of dizziness he recommended . pneumoencephalography, which was performed on January 20, 1956. Examination of the pneumoencephalo-grams indicated to this witness a failure of complete filling of the ventricular system in the anterior portion on the right side, which the witness considered to be a possible indication of the presence of a subdural hygroma.
A second pneumoencephalogram was done under pentothal anesthesia on Feb *792 ruary 9, 19S6, which again indicated a failure of filling of the right lateral ventricle in the region of the temporal horn.
The results of the pneumoencephalo-grams appeared to Dr. Sutton to be consistent with the existence of a space occupying mass in the right temporal region, and on February 10, 1956, Dr. Sutton performed a trephination. The conduct of this operation involved the opening and enlargement of a burr hole about the size of a twenty-five cent piece, the 'opening of the dura, the main membrane overlying the brain, and the exposure of the medial portion of the temporal lobe, the Sylvian fissure, and the inferior frontal lobe. No hygroma nor hematoma was found. A brain needle was introduced, the subdural space was explored with a dural elevator, and no abnormality was disclosed. The wound was closed and the patient discharged after an uneventful course of recovery from the operation.
Dr. Sutton testified that although the operation failed to disclose any space taking intracranial lesion in the area explored, he continued to be of the opinion that, if plaintiff’s symptoms continued, a further exploration in the nature of another treph-ination might be justified.
The testimony of Dr. G. M. Riley, a radiologist of Shreveport who made the pneumoencephalograms of plaintiff, was taken on May 4, 1956. The testimony is not particularly material inasmuch as it simply discloses a possible defect in connection with the “anterior portion of the anterior horn on the right side and in the inferior portion”. The witness testified this condition might be indicative of the presence of a tumor but he could make no positive diagnosis on the basis of the films.
Summarizing the detailed and voluminous testimony in the instant case we find it to be significant only because it completely fails to establish a connection between plaintiff’s accidental injury and his continued subjective symptoms and complaints.
The weight of the testimony of the numerous medical experts definitely preponderates against a conclusion that plaintiff suffered any total permanent disability. Plaintiff has been subjected to drastic and radical exploratory treatment which, in the opinion of the majority of the doctors who testified, has been completely negative.
Upon the basis of all the testimony we have reached certain factual conclusions, namely, that plaintiff suffered a temporary disability as the result of an accident sustained in the course of his employment for which he has been partially compensated; that plaintiff has failed to bear the burden of proof by establishing a causal connection between his accidental injury and his complaints of permanent, total disability.
Before this court counsel for plaintiff has urgently contended that even if plaintiff has failed to establish the existence of continuing physical injury and disability he is nonetheless entitled to recover on the ground that he suffers from a neurosis which in reality is disabling in its effect. Counsel predicates this conclusion upon the statements of certain of the medical witnesses, particularly Dr. Echols’ testimony that plaintiff’s complaints were due to. “conscious or sub-conscious simulation”. Additionally, it is pointed out that Dr. Boy-kin expressed the opinion that plaintiff was. suffering from some disturbance which had; no connection with physical injuries resulting from the accident. In this connection we note that Dr. Boykin refused to. express any opinion as to the real nature- and extent of this neurosis on the ground! that he was not a psychiatrist.
We do not think counsel’s contention is entitled to consideration in the in- • stant case. As is urged by counsel for defendant the question of the existence of a. possible traumatic neurosis is ultra peti-tionem. Counsel for defendant objected to - testimony which would have the effect of" broadening the pleadings, and the objec- *793 tion was sustained' and made general in this respect. We agree with counsel that the basis for this argument is in the nature of an afterthought which was first indicated as a possible ground for recovery by developments in connection with the trial of the case. In a recent case this court considered and applied the principle of the right of recovery on the basis of disability resulting from psychological factors in the nature of hysteria; Jones v. Remington Rand, Inc., 90 So.2d 580. However, our opinion specifically commented •on the point that our consideration of this phase of the case was not subject to the •objection that it -constituted an enlarge•ment of the pleadings in view of the fact that timely objection had not been made •on such ground. A disabling neurosis has :been recently recognized as sufficient ground for recovery by a claimant in a •case very recently decided by our brethren of the First Circuit, Malbreaux v. Barber Bros. Co., 91 So.2d 62. We point out that the conclusion was supported, as stated in the opinion of the court, by the uncontradicted psychiatric testimony of an expert medical witness. No such testimony '.has been offered in the instant case.
Careful examination of the record before us has confirmed us in the conclusion that the only injurious effects established by plaintiff, which were causally •connected with the accident, consisted of an injury to the nerves and muscles of the ■neck from which he had completely recovered by the latter part of June, 1955, and a skull injury which manifested itself 'by headaches and severe pain in the region •of the occipital nerve. Despite the testimony of a number of the medical experts to the effect that they did not consider a neurectomy as being indicated, we cannot escape the fact that plaintiff’s complaints in this respect were alleviated and his pain relieved as the result of the performance of this operation. Under the circumstances we feel that the complaints, although completely subjective, were consistent with the nature of the injury. The disabling effects of the head pains were concluded by the operative procedure and there is no question that this served to remedy the only causally connected injuries and disability which plaintiff suffered as the result of the accident. Under this circumstance we feel that plaintiff is entitled to an award of compensation for the period intervening between the cessation of payments on July 14, 1955, until his recovery from the neurectomy performed on September 23, 1955. The latter date is not certainly established, but, according to Dr. Sutton’s testimony the pain had almost entirely subsided within a brief period following the operation of September 23rd. We think an allowance of compensation for an additional period of twelve, weeks would amply cover a reasonable time for recovery.
In addition to the payment of compensation, of coursé, plaintiff is entitled to payment of medical expenses incurred up to the termination of the period above fixed. The record contains statements aggregating, as best we have been able to compute, the total sum of $322.80, representing charges made by Drs. Sutton and Faludi, amounts paid for medicines and statements of hospital charges by the Physicians & Surgeons Hospital.
For the reasons assigned the judgment appealed 'from is annulled and set aside and it is now ordered, adjudged and decreed that there be judgment in favor of plaintiff, Lewis D. Patrick, and against the defendant, Consolidated Underwriters, for compensation at the rate of $30 per week from date of July 14, 1955, until date of October 6, 1955, together with interest thereon at the legal rate on each unpaid weekly installment of compensation from the date due until paid.
There is further judgment in favor of plaintiff and against the defendant in the sum of $322.80 for medical and hospital expenses, together with all, costs of this suit.
*794 There is further judgment otherwise rejecting plaintiff’s demands.